

NUMBER 13-12-00666-CR

# COURT OF APPEALS

# THIRTEENTH DISTRICT OF TEXAS

# CORPUS CHRISTI – EDINBURG

RYLAND SHANE ABSALON,                                          Appellant,

v.

THE STATE OF TEXAS,                                           Appellee.

**On appeal from the 297th District Court
of Tarrant County, Texas.**

# O P I N I O N

### Before Justices Rodriguez, Garza, and Perkes
### Opinion by Justice Garza

In 1984, eighteen-year-old Ginger Hayden was found stabbed to death in her bedroom. Twenty-six years later, appellant Ryland Shane Absalon was arrested and charged with the offense. In 2012, a Tarrant County jury convicted Absalon of capital murder and sentenced him to life imprisonment. *See* TEX. PENAL CODE ANN. § 19.03(a)(2) (West 2011). On appeal,[1] Absalon argues that: (1) the trial court erred by admitting

---

[1] This appeal was transferred from the Second Court of Appeals pursuant to a docket equalization

evidence of confessions he allegedly made during the course of substance abuse treatment; (2) the trial court erred by admitting into evidence a towel found at the murder scene; (3) the properly-admitted evidence was insufficient to support his conviction; (4) the affidavit supporting the arrest warrant was insufficient; (5) he received ineffective assistance of trial counsel; and (6) the cumulative effect of various errors resulted in an unfair trial.  We affirm.

## I. BACKGROUND

### A. Murder of Ginger Hayden

In the early morning hours of September 5, 1984, Sharon Hayden returned home from her post office job to the Fort Worth, Texas apartment she shared with her daughter Ginger.  When Sharon went into the bathroom, she noticed "something like water on the floor with red around it."  She was too tired to clean it up, so she just put a blue towel over it.  She then went to sleep in her bed.  A few hours later, Sharon woke up to the sound of Ginger's alarm clock.  When she went into Ginger's room, she found her daughter's lifeless body slumped beside her bed.  Ginger was covered in blood and was wearing only underwear.  Sharon felt that Ginger's leg was cold, and she realized Ginger was dead.

In a state of panic, Sharon left her apartment and went upstairs to the apartment of her neighbor, Ryland Shane Absalon, in order to call her boyfriend.  Absalon, then seventeen years old, was a friend of Ginger and Ginger's boyfriend, Jeff Green.  According to Sharon, despite the fact that his neighbor and friend was just found dead, Absalon "was laying on the couch like he didn't give a crap about anything, just laying

---

order issued by the Texas Supreme Court.  *See* TEX. GOV'T CODE ANN. § 73.001 (West 2005).

2

there."

## B. Initial Investigation

Detective Brad Patterson of the Fort Worth Police Department investigated the scene. He noticed no signs of forced entry. However, a sliding glass door leading from Ginger's bedroom to the apartment's back patio was unlocked. Police collected various items for forensic testing, including a bent steak knife found near Ginger's body, two red-stained socks found in the bathroom, and a blue towel found on the bathroom floor.

An autopsy was performed on Ginger's body later that day. A total of 57 stab and cut wounds were identified on her scalp, face, neck, chest, breasts, upper arms, forearms, hands, and legs. One of the stab wounds, on Ginger's neck, was four and a half inches deep. Mark Krouse, M.D., the physician who performed the autopsy, testified that Ginger died of blood loss and that all of the injuries—even ones that would not be considered lethal by themselves—contributed to her death. Dr. Krouse testified that the bent steak knife found at the murder scene was the likely murder weapon. The autopsy report noted that Ginger was in the early first trimester of pregnancy.

Detectives contacted Jeff Green, Ginger's boyfriend at the time of her death. Green stated that he was with Ginger the night before her murder until about 11:30 p.m., when Ginger dropped him off at his home. Green stated that he later left his residence for about thirty minutes to go for a walk after he got into an argument with his father; he then returned home and went to sleep. Green was aware of Ginger's pregnancy and believed that he was the father. He stated that Ginger intended to abort the pregnancy.[2] Green stated that he was with Absalon the previous day and that he told Absalon to come

---

[2] Detectives located, in Ginger's room, a card stating that Ginger had an appointment at Southlake Women's Clinic, a family planning clinic, set for September 6, 1984.

down to Ginger's apartment when he saw Ginger's car return. At trial, Green testified that he and Ginger had intimate relations in Ginger's bedroom on the night before her murder. He testified that Absalon knew that he and Ginger were in a romantic relationship.

Mike Garvin, then a Fort Worth Police Department detective, contacted Absalon and his father, Ralph. Ralph indicated to the detective that, the morning after the murder, Absalon was wearing a white shirt with a red stain on it. Absalon stated that the stain was caused by spilled "strawberry soda," but the detective believed it might actually be blood. Detective Garvin obtained consent of the Absalons to search their apartment for the stained shirt. The detective was unable to locate the stained shirt; however, he recovered an unstained shirt, a pair of shorts, a pair of shoes with apparent blood stains, and a towel. Detectives interviewed Absalon again at Arlington Heights High School several days later. Absalon stated that he had, in the past, been in Ginger's apartment and in her bedroom on several occasions. Once, he climbed over Ginger's patio fence in order to obtain a dropped knife. Absalon stated that, on the night of Ginger's murder, he, Green, and Ginger were hanging out at Ginger's apartment until around 9:00 p.m. During the interview, the interviewing officer observed a small red dot on Absalon's shoe; Absalon stated that it was blood from when he cut his finger while camping.[3]

Police concluded their investigation without making an arrest. The case remained cold for the next quarter century.

---

[3] According to an affidavit filed with the application for an arrest warrant, police also spoke to the Haydens' neighbor Daniel Schwertner. Schwertner told police that, at around 2:00 a.m. on the night of the murder, he heard a noise coming from the general direction of the Haydens' back patio. He looked out his window and saw a white male wearing a dark baseball cap and white t-shirt climb over the fence into the back patio area. Schwertner observed the man "knocking numerous times on Ginger Hayden's back patio." The man then climbed back over the fence and went around the building. Several minutes later, the man came back and again climbed over the fence into the Haydens' back patio and started knocking. When there was no answer at the door, the man walked away from the building. This statement was not presented to the jury at trial but was made part of the application for a warrant to arrest Absalon in 2010.

**C.    DNA Analysis**

Detective Jose Hernandez of the Fort Worth Police Department stated that, in 2008, his agency received a grant from the United States Department of Justice "to go through cold cases and identify which ones could benefit most from DNA testing." The unsolved murder of Ginger Hayden was one of the cases he assessed. Detective Hernandez reviewed the evidence on file and submitted several items for DNA analysis, including the socks and towel found in Ginger's apartment and the shoes recovered from Absalon's apartment.

Forensic analyst Yin Zhang examined the items. With respect to the blue towel, a "presumptive test" was positive for blood. Zhang then performed a "confirmatory test" on the blue towel which was negative for blood. Although the confirmatory test on the blue towel was negative for blood, a DNA profile was obtained from the towel.

Orchid Cellmark ("Cellmark"), a private DNA testing laboratory, analyzed items recovered in the investigation.[4] The DNA profile obtained from a cutting of the blue towel was a mixture, with the major profile originating from an unknown male.[5] The same unknown male was identified as a likely contributor of DNA obtained from the shoe found in Absalon's apartment. Based on these findings, Detective Hernandez applied for a search warrant for a direct sample of Absalon's DNA. The following day, officers located Absalon at his residence in Sierra Vista, Arizona, and obtained DNA samples via buccal

---

[4] Cellmark's supervisor of forensics, Mark Quartaro, testified that Cellmark had originally received items related to Ginger Hayden's murder in 2002. At that time, Cellmark was asked to perform analyses on a knife handle and a light switch. Those analyses revealed no DNA profiles.

[5] Quartaro testified that Cellmark compared the DNA profiles to profiles of Ginger Hayden and Jeff Green which were acquired in 2002. Ginger could not be excluded as a contributor to the minor DNA profile obtained from the blue towel. Quartaro testified that the DNA profile obtained from the blue towel would be expected in approximately one out of 8.475 quadrillion unrelated individuals in North America.

swabs.

Scrapings from the blue towel showed a mixture of DNA consistent with Ginger Hayden and Jeff Green. The major DNA profile obtained from the cutting of the blue towel matched Absalon's DNA, as did the profile obtained from the shoe found in Absalon's apartment.[6] Subsequently, Cellmark analyzed a hair that was situated on one of the socks found at the murder scene. A partial DNA profile obtained from the hair was consistent with Abaslon's DNA.[7] Armed with the DNA testing results, police applied for and obtained a warrant to arrest Absalon and he was taken into custody.

**D.    Group Therapy Confessions**

After Absalon's arrest was publicized in local media, several individuals stepped forward claiming to have information about the crime. All of these individuals had attended an intensive substance abuse treatment program known as Straight, Inc. with Absalon in 1985 and 1986.[8] They testified at trial over the objection of defense counsel.

Robert Shawn Garrett testified that he attended Straight, Inc. at the same time as Absalon. Garrett was twenty years old at the time. Because Garrett was more advanced in the program, he was assigned to host Absalon at his home during nights. Garrett had observed police investigators temporarily pull Absalon out of group sessions at the

---

[6] Cellmark also analyzed the following items: swabs from a bent knife handle, which revealed a partial DNA profile consistent with Ginger Hayden; scrapings from a light blue sock, which revealed a major DNA profile consistent with Ginger Hayden; a cutting from a gray sock, which revealed a complete DNA profile consistent with Ginger Hayden; a cutting from a striped pillowcase, which revealed a partial DNA profile consistent with Ginger Hayden; cuttings from two other pillowcases which revealed no DNA profile; a cutting from a bedsheet which contained semen consistent with Jeff Green's DNA profile; and swabs from a closet door which revealed a partial DNA profile consistent with Ginger Hayden.

[7] Quartaro testified that the partial profile would be expected in approximately one in 805.8 trillion unrelated individuals in North America.

[8] Absalon had pleaded guilty to an unrelated criminal mischief charge in 1985 and the terms of his probation included, among other things, participation in and completion of the Straight, Inc. program.

6

Straight, Inc. treatment center on several occasions; so, one evening Garrett decided, out of curiosity, to ask Absalon why that was. Absalon was at first reluctant to answer but, over the course of a few weeks, he gradually revealed to Garrett that he had stabbed and killed a girl. Absalon told Garrett that the girl had embarrassed him—he wanted to have a romantic relationship with the girl, but the girl refused. Absalon told Garrett that this made him angry. Absalon told Garrett that he got in the girl's apartment through her bedroom window and that he hid in her bedroom closet with the intent to kill her. Absalon told Garrett that it was around 9:00 or 10:00 p.m. and there was no one in the apartment at the time he entered the apartment. Absalon told Garrett that he had a knife and that he waited in the closet until the girl got home, took a shower, got into bed, and fell asleep. Once he thought the girl was asleep, Absalon emerged from the closet and stood next to the bed. He then started stabbing her. She woke up, but he put his hand over her mouth and continued stabbing her. According to Garrett, Absalon said that "he stabbed her until he thought she was dead and he was—he was tired. . . . He heard her moan, and so he started—he stabbed some more." Garrett testified that Absalon told him that he counted the number of times he had stabbed the girl—"Fifty-two, 54, or 57" times. According to Garrett, Absalon was concerned that police would arrest him for the murder, but he was confident he would not be charged, saying: "'They'll never find out. They'll never know.' Because he covered it up too well. 'They'll never know.'"

Garrett had never reported what Absalon told him. That was in part because, as Garrett explained, all Straight, Inc. participants were instructed that everything revealed during the course of treatment must be kept confidential. However, when Garrett saw Sharon Hayden on television "crying tears of excitement" at the news of Absalon's arrest, he felt he had "no choice but to call" the Fort Worth Police Department to report what he

7

had been told twenty-five years earlier.

Stephanie Knight testified that she was sixteen years old when she participated in the Straight, Inc. program in 1985 and 1986. She recalled that Absalon was in the program with her. Knight testified that, at one group session, Absalon admitted that "he killed a girl" by stabbing her a "bunch" of times "when he was high on heroin." She recalled that Absalon said "he had a knife, he waited in a closet for her to come into the bedroom, and then he stabbed her on the bed." She recalled that Absalon said he did it because "he wanted to know what it was like" to kill someone. Straight, Inc. staff then stopped Absalon from speaking and said that the matter would be discussed later. Knight said that Absalon's admission shocked her "[b]ecause that's not the penny ante stuff the other people were talking about."

Knight later graduated from the program and subsequently became a staff member. Knight testified that, after she and Absalon had graduated the program, Absalon lived with her and her mother for less than a year. During that time, Knight never told her mother about what Absalon had said at the group session, because that would have been a violation of Straight, Inc.'s confidentiality rule.

Michelle Valencia testified that she was fifteen years old when she started the Straight, Inc. treatment program in 1985. She stated that Absalon admitted during a group session that he had stabbed and killed a girl. She recalled:

> He was very quiet and somber, I guess is a good word. He was very hesitant to speak and just—it took him a long time to say it. His face was very red. I didn't see a lot of emotion. And he was very—not medicated, but he was just kind of standing there.

She did not tell authorities about Absalon's confession until 2010, when she saw on television that he had been arrested.

8

Teresa Patterson and Chuck Donaldson testified as defense witnesses. Both participated in the Straight, Inc. program with Absalon.[9] Donaldson recalled Absalon stating in a group session that he had killed a girl.[10] When Absalon made the statement, "his face got real red" and he was crying. Donaldson had "never seen anything like it before or since." According to Donaldson, prior to Absalon's statement, Straight, Inc. counselors "told us, gave us, you know, there's a federal law of—federal confidentiality law and explained it to us and how what we hear in there has to stay there, we can't speak it outside of the group or whatever. Something along those lines."

## E. Conditions at Straight, Inc.

Garrett, Knight, Valencia, Patterson, and Donaldson each testified in detail as to the extreme methods employed by Straight, Inc. Participants in the Straight, Inc. program were classified in five categories depending on what phase of treatment they had successfully completed. When a participant first arrived at the program, he or she would be considered a "first-phaser." The first phase of treatment could be as short as two weeks or as long as two years, depending on how well the participant performed. First-phasers were not allowed to go home, but instead had to spend nights at the home of a more advanced participant. Patterson stated: "We were locked in rooms with alarms on

---

[9] Patterson, who did not witness Absalon's confession, testified over the State's relevancy objection. She corroborated the other witnesses' testimony regarding the conditions and methods used at Straight, Inc. The relevance of her testimony is not at issue in this appeal.

[10] Specifically, Donaldson testified:

I don't remember all the details. But he did talk about sneaking into a girl's apartment and hiding in the closet. And, you know, he had a knife and then that he stabbed her multiple times, you know. I don't remember if there was—all I know is I had the impression that it was a lot, he stabbed her a lot.

And he was under the influence of drugs or alcohol. I don't remember exactly what. And he also, you know, whoever it was that he said he killed, you know, it was someone he knew. And there was, you know, there was some kind of jealousy or some kind of romantic thing going on or something like that that kind of precipitated it.

9

the doors, windows, and closets with mattresses on the floor so that there wouldn't be anything in there for us to hurt ourselves or others with because not every kid in there was like every other kid."

Each first-phaser was required to be led around the treatment center by a more advanced participant who would do so by physically holding on to the first-phaser's belt loop. Garrett testified:

> I guess . . . the whole point is to make you feel like a dog on a leash. . . . [A]s much as I disliked a 15-year-old toting me around by the back of my britches, the main reason was to humble me and put me in a position to where I could talk about the things that I needed to talk about.

If an underage participant attempted to leave the treatment center or otherwise misbehaved, staff would physically restrain the participant by "four-pointing" him or her—i.e., by having each of four staff members pin down one of the participant's limbs so that the participant was immobilized.

Once a participant completed all five phases of the program, he or she would graduate from the program.[11]  Garrett told police that the goal of every participant at Straight, Inc. was "just to get out."

Throughout the treatment program, participants were not allowed access to any television, radio, books, newspapers, or other media, and they were not allowed to communicate to anyone outside the treatment center via telephone or any other means. They were required to join in group therapy sessions at the treatment center for sixteen to twenty hours every day, seven days a week.  During the group sessions, participants were required to sit in chairs with "perfect" posture—"with your feet flat on the floor and

---

[11] At the time of Absalon's alleged confession to Garrett, Garrett was a "fifth-phaser" and Absalon was a "first-phaser."

10

hands on your knees and your back erect." More advanced participants were responsible for monitoring the newer participants and were permitted to stand around the circle of chairs during the group sessions. At times, staff members and advanced participants would physically correct other participants' imperfect posture.

The group sessions each had a particular theme—for example, as Garrett testified, "humility, lying, patience, thieving, robbing, that kind of stuff"—but the primary focus was on the participants' substance abuse issues. Participants were strongly encouraged to speak at the group sessions and would not be permitted to advance to the next phase of treatment if they did not speak. However, in order to get called on by the group leader, participants were required to engage in an activity staff called "motivating." According to Garrett:

> [I]f you wanted to get called on in group, if you—really, whether you wanted to talk or not, I am not going to motivate in here. They called it—they called it motivating. And the more you sat in your chair and you flailed your arms and you couldn't make any noise, but you just moved your arms sporadically, and, you know, 127 kids or whatever it was at the time, depending on how hard you're motivated, you know, it was your privilege to stand up and talk.

Knight described "motivating" as "flap[ping] our arms kind of like drunk geese." Garrett agreed with defense counsel's suggestion that "you had to do it ['motivate'] because if you never talk in group, you never got out of first phase." After a participant spoke, the other group members would be able to "confront" the participant if they believed he or she was being dishonest.[12] Confidentiality was paramount. Garrett told police that counselors at Straight, Inc. "worked" Absalon, "tighten[ed] the screws" on him and "wore him out" so

---

[12] Garrett stated that the "fifth-phasers" and other staff members would know if the participants were being dishonest because they would, prior to the group sessions, inform themselves of the details of each participant's individual situation with regard to substance abuse issues.

11

that he would talk about his past and his problems. Garrett said that every participant at Straight, Inc. was subject to this type of treatment. According to Garrett, "[h]onesty . . . was the most important policy."

When asked what was necessary to advance out of the first phase, Garrett replied: "Share and talk, talk about feelings, things that had happened, things you had done. Seeing as that alcohol, drug abuse is a disease of the feelings, that's what we talked about more than anything else." Knight stated that the counselors "wanted to hear the admission of wrongdoings and a plan or a goal of how you were going to make amends." She agreed that "you have to say what they want you to say or you don't move on." Patterson stated that she falsely admitted to being an alcoholic just in order to advance out of the first phase.[13] Valencia stated that she suffered "mental abuse" at Straight, Inc. and that the program was "cult-like." She elaborated:

> I mean, there was some brainwashing going on. I don't believe I was an alcoholic or addict, and they, you know, kind of made me believe that I was . . . . [T]hey kept telling you over and over and over, you wouldn't be here if you're not an alcoholic or addict, and normal people don't do this. And, you know, just over and over, you just begin to believe it.

Garrett testified that he believed the Straight, Inc. program was "the toughest in the country" but that it worked for him because he has been clean and sober since he graduated from the program. A year after he graduated the program, he came back to work at Straight, Inc. as a staff member.[14] Valencia agreed with defense counsel that

---

[13] Knight also stated she falsely admitted to being an alcoholic in order to advance out of the first phase. She later clarified that this did not occur at Straight, Inc., but rather, at a different treatment program.

[14] Defense counsel asked Garrett:

Do you know—you're aware that a lot of people that went through this program later developed psychological problems, there's been a number of suicides, and there's been lawsuits. You're aware of all of the activity that's occurred since 1993 when these programs were shut down. You're aware of that, aren't you?

Straight, Inc. eventually "got shut down by the authorities" in part because of "abuse going on" at the treatment centers. She denied ever being physically abused at the program.

## F. Verdict

The jury found Absalon guilty and he was sentenced to life imprisonment.[15] Absalon then filed a motion for new trial alleging in part that he received ineffective assistance of trial counsel. The motion was overruled by operation of law. *See* TEX. R. APP. P. 21.8. This appeal followed.

## II. DISCUSSION

## A. Substance Abuse Treatment Privilege

Prior to trial, Absalon moved to suppress evidence of his confessions made at Straight, Inc. on grounds that they were statements made in the course of voluntary substance abuse treatment. *See* TEX. CODE CRIM. PROC. ANN. art. 38.101 (West 2005); TEX. R. EVID. 509(b). Garrett and Valencia testified at the suppression hearing. After the hearing, the trial court took the motion in abeyance. The following day, prior to voir dire, the trial court pronounced its ruling as follows:

> [T]he evidence in this case is that [Absalon] was not being treated voluntarily but was under a court order, court-ordered condition of probation to attend and comply with the Straight[, Inc.] program[. T]he problem word is "voluntarily," and the word must be there for a reason or as an important distinction on whether or not a communication is confidential when given by one person as opposed to another. It might seem important for all patients

Garrett replied, "No."

[15] Because Absalon was under eighteen years of age at the time of the offense, he was not eligible for the death penalty. *See Roper v. Simmons*, 543 U.S. 551, 568, 578 (2005) (holding that the imposition of the death penalty on offenders who committed a crime before turning eighteen years old is unconstitutional). Moreover, the section of the penal code requiring that defendants convicted of capital felonies for whom the death penalty is not sought must be sentenced to life without parole, *see* TEX. PENAL CODE ANN. § 12.31(a) (West 2011), is not applicable because the offense took place before September 1, 2005. *See* Act of June 17, 2005, 79th Leg., R.S., ch. 787, § 17, 2005 TEX. GEN. LAWS 2705, 2709; *see also Miller v. Alabama*, 132 S.Ct. 2455, 2463, 2469 (2012) (holding that mandatory life sentence without possibility of parole for defendants under the age of eighteen at the time of their crimes violates the Eighth Amendment's prohibition of cruel and unusual punishment).

13

to communicate freely to aid in the treatment. On the other hand, it seems that the purpose may be for patients to seek treatment voluntarily when they might not otherwise do so. A patient who is being treated involuntarily or by court order does not need encouragement because he is already being compelled to attend, and so his communication is not protected as would . . . a voluntary communication by a patient. . . .

Because [Absalon] was not being treated voluntarily, but rather was court-ordered to attend, the Court rules that his communication to the group was not confidential, and is therefore admissible . . . through the testimony of Michelle Valencia and the other two witnesses who may be called to testify. However, the Court is somewhat troubled and concerned in its ruling because while it may be the correct ruling, the correct legal ruling, it does not seem to be or to lead to the proper or fair result. If the State is as concerned as the Court is, it may not wish to use the testimony of the group members.[16]

Absalon argues by his first two issues that this ruling was erroneous.[17]

### 1.    Standard of Review

We review a trial court's ruling on a motion to suppress evidence for abuse of discretion. *Crain v. State*, 315 S.W.3d 43, 48 (Tex. Crim. App. 2010). A trial court abuses its discretion when its ruling is arbitrary or unreasonable. *State v. Mechler*, 153 S.W.3d 435, 439 (Tex. Crim. App. 2005). The trial court's ruling on the motion to suppress will be affirmed if it is reasonably supported by the record and is correct under any theory of law applicable to the case. *Young v. State*, 283 S.W.3d 854, 873 (Tex. Crim. App. 2009). At the suppression hearing, the trial court is the sole trier of fact and exclusive judge of the credibility of the witnesses and the weight to be given to their testimony. *See St. George v. State*, 237 S.W.3d 720, 725 (Tex. Crim. App. 2007).

In reviewing a trial court's ruling on a motion to suppress, we apply a bifurcated

---

[16] Evidently, the State did not share the trial court's concern as to the propriety of the evidence, as it called all three group members to testify at the guilt-innocence phase of trial.

[17] At the suppression hearing, the trial court also considered Absalon's motion to suppress certain statements he made to police officers after being arrested in Arizona. The trial court granted that motion and suppressed those statements. The issue is not raised on appeal.

standard of review. *Wilson v. State*, 311 S.W.3d 452, 457–58 (Tex. Crim. App. 2010). Although we give almost total deference to the trial court's determination of historical facts, we conduct a de novo review of its application of the law to those facts. *See id.* at 458. We afford almost total deference to the trial court's rulings on mixed questions of law and fact when the resolution of those questions depends on an evaluation of credibility and demeanor. *See State v. Johnston*, 336 S.W.3d 649, 657 (Tex. Crim. App. 2011). We review de novo mixed questions of law and fact that do not depend on an evaluation of credibility and demeanor. *Id.* All purely legal questions are reviewed de novo. *Id.*

### 2. Applicable Law

> A communication to any person involved in the treatment or examination of drug abusers by a person being treated voluntarily or being examined for admission to voluntary treatment for drug abuse is not admissible. However, information derived from the treatment or examination of drug abusers may be used for statistical and research purposes if the names of the patients are not revealed.

TEX. CODE CRIM. PROC. ANN. art. 38.101.

> There is no physician-patient privilege in criminal proceedings. However, a communication to any person involved in the treatment or examination of alcohol or drug abuse by a person being treated voluntarily or being examined for admission to treatment for alcohol or drug abuse is not admissible in a criminal proceeding.

TEX. R. EVID. 509(b).

### 3. Analysis

By his first issue, Absalon contends that evidence of his confessions should have been suppressed under article 38.101 of the code of criminal procedure and rule of evidence 509(b). There is no dispute that the statements were made during the course of substance abuse treatment, and there is no suggestion that they were made while Absalon was "being examined for admission" to treatment. *See* TEX. CODE CRIM. PROC.

15

ANN. art. 38.101; TEX. R. EVID. 509(b). The issue therefore turns on whether Absalon was "being treated voluntarily." *See* TEX. CODE CRIM. PROC. ANN. art. 38.101; TEX. R. EVID. 509(b).[18]

We agree with the trial court that Absalon was not "being treated voluntarily" at Straight, Inc. The record establishes that, on July 7, 1986, Absalon pleaded guilty to an unrelated criminal mischief charge; that the trial court adjudicated Absalon guilty and sentenced him to one year in the Tarrant County Jail; that the trial court suspended the sentence and rendered an order placing Absalon on probation for one year; and that one of the conditions of Absalon's probation was to participate and fully complete the Straight, Inc. program. The record further reflects that Absalon entered into a plea bargain agreement which provided that the State would recommend a sentence of one year of probation, restitution, and participation in the Straight, Inc. program. If Absalon had failed to participate in and fully complete the Straight, Inc. program pursuant to the court's order, he would have been subject to arrest and imposition of the original jail sentence. *See* TEX. CODE CRIM. PROC. ANN. art. 12.42, § 21(b) (West Supp. 2011) ("At any time during the period of community supervision the judge may issue a warrant for violation of any of the conditions of the community supervision and cause the defendant to be arrested.").

Absalon contends that he was "being treated voluntarily" because he entered into

---

[18] The State argues that the statute is not applicable because Garrett, Knight, and Valencia are not "person[s] involved in the treatment or examination" of substance abuse. *See* TEX. CODE CRIM. PROC. ANN. art. 38.101 (West 2005); TEX. R. EVID. 509(b). We assume for purposes of this argument, but do not decide, that those witnesses are, in fact, "person[s] involved in the treatment or examination" of substance abuse.

The State further argues that any error in admitting the testimony was harmless because Absalon called Donaldson—who testified as to Absalon's confession at Straight, Inc.—as a witness. *See, e.g., McNac v. State*, 215 S.W.3d 420, 425 (Tex. Crim. App. 2007) (noting that improper admission of evidence is not reversible error if the same facts are shown by other evidence which is not challenged). Because we have found no error in the admission of the evidence, we need not decide whether any error was harmless.

16

the plea bargain agreement voluntarily; he notes that he could have declined the plea bargain offer and instead proceeded to trial. But that does not change the fact that, after Absalon voluntarily entered into a plea bargain agreement, he was ordered by a court to participate and complete the Straight, Inc. program. In light of this central fact, we cannot say that Absalon was participating "voluntarily" in the program.[19] *See In re G.K.H.*, 623 S.W.2d 447, 448 (Tex. App.—Texarkana 1981, no writ) (holding, in a juvenile delinquency case, that article 38.101 did not apply because the juvenile "did not voluntarily submit himself for treatment" but was rather ordered by a court to receive treatment). Accordingly, the trial court did not abuse its discretion in denying Absalon's motion to suppress statements he made during the course of the program under article 38.101 of the code of criminal procedure and rule of evidence 509(b).

By his second issue, Absalon argues that evidence of his confessions should have been excluded because the witnesses "effectively were acting . . . as state agents, eliciting testimony in violation of [Absalon]'s Fifth Amendment rights while assuring him that his statements were absolutely confidential and could not be used against him." Absalon did not make this argument before the trial court[20]; accordingly, it is waived. *See* TEX. R. APP. P. 33.1. Even if the issue were preserved, a confession does not violate due process or the Fifth Amendment in the absence of "police overreaching," *see Oursbourn v. State*,

_____

[19] Absalon notes that Garrett testified that both he and Absalon were "there [i.e., at Straight, Inc.] by choice." However, it is not clear whether Garrett actually knew that Absalon was ordered by a court to participate in the program. In any event, considering the clear documentary evidence of Absalon's conviction and the terms of his probation, Garrett's testimony does not render the trial court's decision erroneous.

[20] Absalon did raise the issue of his Fifth Amendment right against self-incrimination, but only with regard to statements he made to officers when he was apprehended in Arizona. As noted, the trial court granted Absalon's motion to suppress that evidence and the issue is not raised on appeal. Absalon did not raise any Fifth Amendment or due process issue with regard to the Straight, Inc. witnesses.

17

259 S.W.3d 159, 169 (Tex. Crim. App. 2008), and Absalon does not cite any authority establishing that fellow Straight, Inc. participants may be considered agents of police in this context. We overrule Absalon's first two issues.[21]

## D.     Sufficiency of Warrant Application and Admissibility of Towel

Absalon argues by his fourth issue that the affidavit supporting the warrant for his arrest was insufficient to show probable cause because the officer affiant mentioned the results of the "presumptive test" showing the presence of blood on the blue towel recovered at the murder scene, but not the results of the "confirmatory test" which seemed to show the contrary. By his fifth issue, he argues that evidence of the "presumptive test" was inadmissible.

### 1.     Standard of Review and Applicable Law

In determining the sufficiency of an affidavit supporting an arrest warrant, a reviewing court is limited to the "four corners" of the affidavit. *McFarland v. State*, 928 S.W.2d 482, 509 (Tex. Crim. App. 1996), *disavowed on other grounds by Mosley v. State*, 983 S.W.2d 249, 263 n.18 (Tex. Crim. App. 1998). The affidavit is viewed in a common-sense, not hypertechnical, fashion. *Id.* "Even in close cases we give great deference to a magistrate's determination of probable cause to encourage police officers to use the warrant process rather than making a warrantless search and later attempting to justify their actions by invoking some exception to the warrant requirement." *Rodriguez v. State*, 232 S.W.3d 55, 59 (Tex. Crim. App. 2007).

> [W]here the defendant makes a substantial preliminary showing that a false statement knowingly and intentionally, or with reckless disregard for the truth, was included by the affiant in the warrant affidavit, and if the allegedly false statement is necessary to the finding of probable cause, the

---

[21] We express no opinion on the trial court's statement that denial of the motion to suppress, while "the correct legal ruling, . . . does not seem to be or to lead to the proper or fair result." We merely hold that the ruling was not an abuse of discretion under the law applicable to the case.

18

Fourth Amendment requires that a hearing be held at the defendant's request. In the event that at that hearing the allegation of perjury or reckless disregard is established by the defendant by a preponderance of the evidence, and, with the affidavit's false material set to one side, the affidavit's remaining content is insufficient to establish probable cause, the search warrant must be voided and the fruits of the search excluded to the same extent as if probable cause was lacking on the face of the affidavit.

*Franks v. Delaware*, 438 U.S. 154, 155–56 (1978). Under *Franks*, the false statement in the affidavit must have been either intentional or made with reckless disregard for the truth, and must have been necessary to the finding of probable cause, in order to render the warrant invalid. *Dancy v. State*, 728 S.W.2d 772, 782 (Tex. Crim. App. 1987) (citing *Franks*, 438 U.S. at 155–56). A misstatement in an affidavit that is merely the result of simple negligence or inadvertence, as opposed to reckless disregard for the truth, will not render invalid the warrant based on it. *Id.* at 783 (citing *Franks*, 438 U.S. at 171).

### 2.    Analysis

The affidavit supporting the application for arrest warrant stated, in relevant part:

[T]he blue towel that was collected from the bathroom floor (put there by Sharon Hayden who laid the blue towel over a puddle of water that had what she described as red stuff inside the water) was screened by the Fort Worth Police Lab. A cutting collected from the towel that tested presumptive positive for blood was sent for DNA testing. The report reads that the DNA profile obtained from the cutting of the blue towel is a mixture. The major profile originated from an unknown male and Ginger Hayden cannot be excluded as a possible contributor to the mixture. The same unknown male appears to be a contributor of DNA to the cutting of the blue towel and the tan leather shoes belonging to [Absalon].

The affidavit said nothing about the "confirmatory test" or its results.

Detective Thomas O'Brien of the Fort Worth Police Department was the affiant. He testified that, prior to executing the affidavit, he asked forensic technicians about the result of the "presumptive test" and they informed him that the results of that test showed the presence of blood but that they were unable to determine whether it was human blood.

Detective O'Brien testified that he asked the technicians whether that result meant the towel contained no human blood. According to the detective, he was informed that "that's not what it means . . . in fact, it wouldn't be abnormal for blood that is old and degraded to not necessarily be positive on a confirmatory test or a human blood test." Detective O'Brien testified: "I guess in relation to the human blood test and the confirmatory test, I understood that as the same thing."

When the State sought to admit evidence of the "presumptive test" on the blue towel, defense counsel objected and took forensic analyst Zhang on voir dire. Zhang characterized the "presumptive test" as "a quick and easy test . . . to screen the evidence and using a chemical reagent based on the color change." She explained that the positive result on the presumptive test could mean that the blue towel contained human blood or animal blood, or it could be a false positive generated by something like a vegetable product. Zhang further explained that the "confirmatory test" on the same towel resulted in a negative finding for blood. Zhang indicated that the result of the confirmatory test could indicate that there was no actual blood on the sample, but it could also indicate that there was not enough blood—or that any blood was too old—to be detected. Crucially, the evidence established that, although the confirmatory test was negative for blood, a DNA profile was nevertheless retrieved from the towel, and, as stated in the affidavit, the DNA profile on the towel was consistent with the DNA profile obtained from Absalon's shoes.

The affidavit mentions the positive presumptive test and it mentions that a DNA profile was obtained from the towel, but it neglects to mention that a confirmatory test was done and resulted in a negative finding for blood. In that regard it can arguably be described as misleading. But Detective O'Brien's testimony establishes that he did not

20

omit information about the confirmatory test intentionally or with reckless disregard for the truth. *See Dancy*, 728 S.W.2d at 782. Instead, he believed that the crime lab's finding that it could not confirm the presence of human blood was the confirmatory test. At worst, Detective O'Brien's omission of the confirmatory test result was the product of negligence or inadvertence; therefore, it does not constitute grounds to invalidate the warrant. *See id.* at 783. We note, moreover, that inclusion of the confirmatory test results in the affidavit would likely not have changed the magistrate's decision to issue the warrant. It is undisputed that a DNA profile was, in fact, obtained from the towel, despite the negative confirmatory test finding for blood. That is, the magistrate likely would have found probable cause and approved the warrant application even if he or she had known about the negative confirmatory test result because, as Detective O'Brien averred, the DNA profile obtained from the towel was consistent with the profile obtained from blood on Absalon's shoes.

With regard to admissibility of the presumptive test at trial, Absalon argues that the trial court "fail[ed] in its gatekeeper mission as to scientific evidence." *See Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579 (1993) (holding that when the subject of expert testimony is scientific knowledge, the basis of the testimony must be grounded in accepted scientific methods and procedures); *E.I. du Pont de Nemours & Co., Inc. v. Robinson*, 923 S.W.2d 549, 557 (Tex. 1995) ("Scientific evidence which is not grounded in the methods and procedures of science is no more than subjective belief or unsupported speculation."). We disagree. There was no evidence indicating that the presumptive test was improperly performed or was inaccurate.[22] Zhang's testimony

---

[22] Absalon does not argue that evidence of the presumptive test was irrelevant or unfairly prejudicial. *See* TEX. R. EVID. 401, 403.

21

established that both the presumptive and confirmatory tests are scientifically accepted and regularly used; that the tests are different; that the confirmatory test is more sensitive; and that the two tests may have resulted in seemingly contradictory findings if, among other things, the tested item contained blood that was too old. It is noteworthy that the trial court admitted evidence of the positive presumptive test on the express condition that the jury be made aware of the subsequent negative confirmatory test. Evidence of both tests was before the jury and defense counsel had the opportunity to cross-examine Zhang and other witnesses about the test results. Under these circumstances, we cannot say the trial court abused its discretion by admitting evidence of the presumptive test. *See Crain*, 315 S.W.3d at 48. Absalon's fourth and fifth issues are overruled.

## C. Evidentiary Sufficiency

By his sixth issue, Absalon contends that, without the allegedly inadmissible forensic evidence and evidence of his confessions, the evidence adduced at trial was insufficient to support his conviction.

In reviewing the sufficiency of evidence supporting a conviction, we consider the evidence in the light most favorable to the verdict to determine whether any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *Hacker v. State*, 389 S.W.3d 860, 865 (Tex. Crim. App. 2013); *see Brooks v. State*, 323 S.W.3d 893, 895 (Tex. Crim. App. 2010) (plurality op.) (citing *Jackson v. Virginia*, 443 U.S. 307, 319 (1979)). We give deference to "the responsibility of the trier of fact to fairly resolve conflicts in testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts." *Hooper v. State*, 214 S.W.3d 9, 13 (Tex. Crim. App. 2007) (citing *Jackson*, 443 U.S. at 318–19). When faced with conflicting evidence, we presume that the trier of fact resolved any such conflict in favor of the prosecution, and

we defer to that resolution. *State v. Turro*, 867 S.W.2d 43, 47 (Tex. Crim. App. 1993).

Sufficiency of the evidence is measured by the elements of the offense as defined by a hypothetically correct jury charge. *Malik v. State*, 953 S.W.2d 234, 240 (Tex. Crim. App. 1997). Such a charge is one that accurately sets out the law, is authorized by the indictment, does not unnecessarily increase the State's burden of proof or unnecessarily restrict the State's theories of liability, and adequately describes the particular offense for which the defendant was tried. *Id.* Here, a hypothetically correct jury charge would state that Absalon is guilty of the indicted offense if he intentionally caused Ginger Hayden's death while in the course of committing or attempting to commit burglary. TEX. PENAL CODE ANN. § 19.03(a)(2). A person commits burglary if, without the effective consent of the owner, the person:

(1) enters a habitation, or a building (or any portion of a building) not then open to the public, with intent to commit a felony, theft, or an assault; or

(2) remains concealed, with intent to commit a felony, theft, or an assault, in a building or habitation; or

(3) enters a building or habitation and commits or attempts to commit a felony, theft, or an assault.

*Id.* § 30.02(a) (West 2011). A person commits assault if the person "intentionally, knowingly, or recklessly causes bodily injury to another." *Id.* § 22.01(a) (West 2011).[23]

We have already determined, contrary to the assumption made in Absalon's discussion of his sixth issue, that the trial court did not err by admitting evidence of

---

[23] A person acts "intentionally" with respect to the result of his conduct when it is his conscious objective or desire to cause the result. TEX. PENAL CODE ANN. § 6.03(a) (West 2011). A person acts "knowingly" with respect to the result of his conduct when he is aware that his conduct is reasonably certain to cause the result. *Id.* § 6.03(b). A person acts "recklessly" with respect to the result of his conduct when he is aware of but consciously disregards a substantial and unjustifiable risk that the result will occur. *Id.* § 6.03(c).

Absalon's confessions at Straight, Inc. or evidence of the positive presumptive blood test on the blue towel. Even if the evidence were improperly admitted at trial, we must still consider it in evaluating evidentiary sufficiency. *See Moff v. State*, 131 S.W.3d 485 (Tex. Crim. App. 2004) ("[A]n appellate court must consider all evidence actually admitted at trial in its sufficiency review . . . . [A]n appellant is not entitled to have an appellate court first consider the appellant's complaints concerning improper admitted evidence and, if it resolves any of those in favor of the appellant, to then, second, consider the sufficiency of the properly-admitted evidence to support the conviction."). And, considering that evidence, we conclude that a rational trier of fact could have found the elements of the crime beyond a reasonable doubt. Garrett, Knight, Valencia, and Donaldson each testified that Absalon confessed to the crime in one of the Straight, Inc. group sessions. The witnesses recounted that Absalon stated that he waited in the victim's closet until she went to bed, then he emerged from the closet and began stabbing her. According to Garrett, Absalon stated that he stabbed the girl "[f]ifty-two, 54, or 57" times, which is chillingly consistent with the autopsy results showing 57 stab and cut wounds. Garrett and Donaldson each testified that Absalon killed the girl out of jealousy. *See Guevara v. State*, 152 S.W.3d 45, 50 (Tex. Crim. App. 2004) ("Motive is a significant circumstance indicating guilt."). Detective Garvin testified that, the morning after the murder, Absalon was seen wearing a white shirt with a red stain on it. Sharon Hayden testified that, when she informed Absalon of the murder, he acted as if "he didn't give a crap about anything." Finally, Absalon's DNA was found on the blue towel recovered from Ginger Hayden's apartment, and his DNA is consistent with a partial profile obtained from a hair located on a sock found at the scene. From all of this evidence, the jury could have reasonably concluded that Absalon intentionally caused Ginger Hayden's death and that he did so

24

while "remain[ing] concealed, with intent to commit . . . an assault, in a building or habitation." TEX. PENAL CODE ANN. § 30.02(a)(2); *see Guevara*, 152 S.W.3d at 50 (noting that intent may be inferred from circumstantial evidence such as acts, words, and the conduct of the appellant).

Absalon's sixth issue is overruled.

## E.    Ineffective Assistance of Counsel

By his third issue, Absalon argues that his Sixth Amendment right to counsel was violated because his trial counsel provided ineffective assistance.

### 1.    Standard of Review and Applicable Law

To obtain a reversal of a conviction for ineffective assistance of counsel, a defendant must show that (1) counsel's performance fell below an objective standard of reasonableness and (2) counsel's deficient performance prejudiced the defense, resulting in an unreliable or fundamentally unfair outcome of the proceeding. *Davis v. State*, 278 S.W.3d 346, 352 (Tex. Crim. App. 2009) (citing *Strickland v. Washington*, 466 U.S. 668, 687 (1984)). "Deficient performance means that 'counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment.'" *Ex parte Napper*, 322 S.W.3d 202, 246 (Tex. Crim. App. 2010) (quoting *Strickland*, 466 U.S. at 687). The prejudice prong requires showing "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 248 (citing *Strickland*, 466 U.S. at 694). "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* (citing *Strickland*, 466 U.S. at 694). "[E]ach case must be judged on its own unique facts." *Davis*, 278 S.W.3d at 353.

The burden is on Absalon to prove ineffective assistance of counsel by a

preponderance of the evidence.  *Thompson v. State*, 9 S.W.3d 808, 813 (Tex. Crim. App. 1999).  He must overcome the strong presumption that counsel's conduct fell within the wide range of reasonable professional assistance and that counsel's actions could be considered sound trial strategy.  *See Strickland*, 466 U.S. at 689; *Jaynes v. State*, 216 S.W.3d 839, 851 (Tex. App.—Corpus Christi 2006, no pet.).  A reviewing court will not second-guess legitimate tactical decisions made by trial counsel.  *State v. Morales*, 253 S.W.3d 686, 696 (Tex. Crim. App. 2008) (noting that, "unless there is a record sufficient to demonstrate that counsel's conduct was not the product of a strategic or tactical decision, a reviewing court should presume that trial counsel's performance was constitutionally adequate").  Counsel's effectiveness is judged by the totality of the representation, not by isolated acts or omissions.  *Thompson*, 9 S.W.3d at 813; *Jaynes*, 216 S.W.3d at 851.

An allegation of ineffectiveness must be firmly founded in the record, and the record must affirmatively demonstrate the alleged ineffectiveness.  *Bone v. State*, 77 S.W.3d 828, 835 (Tex. Crim. App. 2002); *Thompson*, 9 S.W.3d at 814 n.6.  "[T]rial counsel should ordinarily be afforded an opportunity to explain his actions before being denounced as ineffective."  *Goodspeed v. State*, 187 S.W.3d 390, 392 (Tex. Crim. App. 2005).  "Absent such an opportunity, an appellate court should not find deficient performance unless the challenged conduct was 'so outrageous that no competent attorney would have engaged in it.'"  *Id.* (quoting *Garcia v. State*, 57 S.W.3d 436, 440 (Tex. Crim. App. 2001)).

### 2.    Ineffectiveness Allegations

On appeal, Absalon complains of several actions and omissions by trial counsel. First, he contends that his counsel was ineffective by failing "to develop fully the Straight

story for the jury as to false confessions as a policy and practice, as well as the use of 'peer counselors' to intimidate and abuse participants." Absalon claims that counsel "called only two witnesses, both [of] who[m] were in the Dallas program with [Absalon], but did not seek to present the jury with more pervasive accounts of the Straight program's brainwashing techniques."

Second, Absalon complains that his trial counsel "regularly failed to object to the admission of evidence for which the State never established a chain of custody" and "failed to insist on the right to confrontation of witnesses who actually performed the tests." In particular, Absalon argues that the State never established a chain of custody as to: (1) the hair located on the sock found in Ginger Hayden's apartment; (2) the socks recovered from the apartment; (3) the bent steak knife identified as the likely murder weapon by Dr. Krouse; (4) fingernail cuttings from Ginger Hayden, which contained a DNA profile as to which Absalon and Green were excluded as possible major contributors but could not be excluded as minor contributors; and (5) the buccal swabs obtained by police in Arizona. Absalon further argues that trial counsel should have objected to the qualifications of Detectives Patterson, Garvin, Hernandez, and O'Brien to testify regarding evidentiary matters.

Third, Absalon argues that his trial counsel should have retained experts to rebut the State's DNA evidence and Dr. Krouse's testimony regarding the likely murder weapon.

Fourth, he contends that counsel erred by failing to request that the jury be sequestered or that venue be transferred because of the publicity surrounding the case.

Fifth, Absalon claims that counsel failed to argue that Absalon's confessions were false and that the detailed nature of the confessions can be explained by the fact that

27

details of the crime were publicized contemporaneously.

Finally, Absalon argues his trial counsel was ineffective because he failed to raise the possibility that the crime was in fact committed by another suspect, Horace Cox, whose shoes had a tread pattern similar to the patterns found in Ginger Hayden's back patio.

### 3. Analysis

With respect to trial counsel's alleged failure to call additional witnesses to testify as to the Straight, Inc. program, we note that the failure to call a particular witness constitutes ineffective assistance only if the appellant shows that such witness was available for trial and would have given testimony that actually benefitted the defense. *Perez v. State*, 310 S.W.3d 890, 894 (Tex. Crim. App. 2010). Absalon has not identified any particular witness that he believes should have been called by defense counsel. In any event, the jury heard exhaustive, comprehensive testimony regarding the conditions and methods of Straight, Inc. from five witnesses that participated in the program at the same time as Absalon—not just the two called by defense counsel. Accordingly, Absalon has not shown that counsel's alleged failure in this regard was prejudicial.

With respect to the remainder of Absalon's complaints, the record does not contain any indication as to trial counsel's reasons for the challenged actions and omissions.[24] Moreover, the actions were not "so outrageous that no competent attorney would have engaged in it." *Goodspeed*, 187 S.W.3d at 392 (quoting *Garcia v. State*, 57 S.W.3d at

---

[24] Absalon's motion for new trial included affidavits by his appellate counsel and a DNA crime lab director from Oklahoma, each cursorily alleging that trial counsel's actions and omissions constituted ineffective assistance. However, no hearing was held on the motion, and the trial court was not otherwise presented with any evidence as to trial counsel's strategy. We note that challenges requiring development of a record to substantiate a claim, such as ineffective assistance of counsel, may be raised in an application for writ of habeas corpus. *See* TEX. CODE CRIM. PROC. ANN. art. 11.07 (West Supp. 2011); *Cooper v. State*, 45 S.W.3d 77, 82 (Tex. Crim. App. 2001).

440). Therefore, we cannot conclude that counsel provided ineffective assistance on those bases. *See id.* ("Direct appeal is usually an inadequate vehicle for raising such a claim because the record is generally undeveloped."); *Mallett v. State*, 65 S.W.3d 59, 63 (Tex. Crim. App. 2001) ("[W]hen the record is silent as to why counsel failed to object, it is difficult for a defendant to overcome the first prong of *Strickland*."); *Thompson*, 9 S.W.3d at 813–14.

Absalon's third issue is overruled.

## F.     Cumulative Error

By his eighth issue, Absalon contends that, even if no error is found sufficient to warrant reversal, the cumulative effect of various errors has resulted in an unfair trial. The Texas Court of Criminal Appeals has recognized that "a number of errors may be found harmful in their cumulative effect even if each error, considered separately, would be harmless." *Chamberlain v. State*, 998 S.W.2d 230, 238 (Tex. Crim. App. 1999). However, non-errors may not cumulatively produce harm. *See Hughes v. State*, 24 S.W.3d 833, 844 (Tex. Crim. App. 2000). Having found no error in our review of Absalon's other appellate issues, we conclude that the cumulative error doctrine does not apply. Absalon's eighth issue is therefore overruled.

## III. CONCLUSION

We affirm the judgment of the trial court.

 

_____
DORI CONTRERAS GARZA,
Justice

Publish.
TEX. R. APP. P. 47.2(b)
Delivered and filed the
13th day of February, 2014.

29