

# In the
# Court of Appeals
# Second Appellate District of Texas
# at Fort Worth

———————————————————

No. 02-24-00209-CR

———————————————————

CARLOS JEREMY NELSON RACHAL, Appellant

V.

THE STATE OF TEXAS

—————————————————————————————————

On Appeal from the 297th District Court
Tarrant County, Texas
Trial Court No. 1772533

—————————————————————————————————

Before Birdwell, Bassel, and Womack, JJ.
Memorandum Opinion by Justice Womack

# MEMORANDUM OPINION

## I. INTRODUCTION

A jury found Appellant Carlos Jeremy Nelson Rachal guilty of one count of continuous sexual abuse of a young child and one count of indecency with a child stemming from his abuse of B.R. (Bella).[1] *See* Tex. Penal Code Ann. §§ 21.02(b), .11(d). The jury assessed his punishment at thirty years' confinement for continuous sexual abuse of a young child and five years' confinement for indecency with a child, and the trial court sentenced him accordingly, with the sentences to run concurrently. In five points on appeal, Rachal argues that (1) the trial court erred by denying his motion for directed verdict on the count of continuous sexual abuse of a young child, (2) the trial court erred by including certain language in the jury charge, (3) he was denied effective assistance when his trial counsel declined the trial court's offer to question jurors who discussed the case mid-trial and who seemingly talked about whether he would testify, (4) he was denied effective assistance when his trial counsel failed to object to the alleged bolstering of Bella's testimony by another witness, and (5) the alleged errors constitute cumulative error sufficient to warrant reversal.

---

[1]In some portions of the record, B.R.'s initials are transposed as R.B. To protect her anonymity, we use an alias to refer to her and to some of her family members. *See* Tex. R. App. P. 9.10(a)(3); *McClendon v. State*, 643 S.W.2d 936, 936 n.1 (Tex. Crim. App. [Panel Op.] 1982).

2

## II. BACKGROUND

### A. The Relationship Between Rachal and Bella's Mother

Bella was born in September 2011. In or around February 2020, Bella's mother, N.R. (Mother), started dating Rachal after they connected on an online dating website. Around October 2020, Rachal and Mother moved in together at an apartment in Mansfield, Texas. At that time, Bella had one older sister and one younger sister. Bella and her sisters lived with Mother and Rachal at the apartment on weekends, but the three girls stayed with Mother's grandparents during the week. According to Mother, Rachal treated Bella differently than he did Bella's sisters. Mother stated that Rachal bought Bella more things and took her to more places than he did her sisters.

In January 2021, Mother learned that she was pregnant with Rachal's child. In August 2021, Mother gave birth to a daughter, K.R. (Kylie).

### B. The Alleged Abuse

At trial, Bella testified that Rachal had sexually abused her. She said that she was in the fifth grade the first time anything "uncomfortable" happened with Rachal, although she also said that Rachal had been touching her "privates" since she was in the sixth grade. She stated that the first time he did so, she was in the kitchen getting a drink of water, when Rachal grabbed her arm and led her to a couch in the living room. According to Bella, when they got to the couch, Rachal pulled her shorts down and touched her vagina with his finger. On cross-examination, Bella indicated that

this first instance of abuse had occurred in the kitchen near a dishwasher, not on the living room couch.

Bella testified about another incident that occurred in the kitchen. She stated that while in the kitchen, Rachal pulled his pants down, took out his penis, grabbed her hand and placed it on his penis, and moved her hand back and forth. She stated that a "[w]hite and clear" substance came out of his penis on that occasion.

Bella described another occasion when Rachal entered her bedroom while her sisters were present.[2] According to Bella, he got on top of her bed, moved his hand under her shirt and bra, and touched her breasts.

Bella stated that on another occasion when she was playing hide-and-seek with her sisters, she and Rachal hid in a closet. She said that while she was in the closet, Rachal pulled his penis out, grabbed her arm, and made her touch his penis.

According to Bella, Rachal also showed her a video on his phone of a girl performing oral sex on a man. She stated that after Rachal showed her the video, he took his penis out, put his hand behind her head, and pushed her head toward his penis. She said that although Rachal's penis did not enter her mouth on this occasion, it made contact with it.

Bella described two incidents that took place in Mother's room that occurred while Bella was watching Kylie. Bella told the jury that in one of the incidents, she

---

[2]It is unclear which sisters were present during this incident. Bella stated that she shared a bedroom with her sisters.

was watching a movie with Kylie[3] when Rachal came into the room. Bella said that Rachal pulled his pants down, spread her legs, moved her pants away, and put his penis on top of her vagina. She indicated that he stopped when she tried to push him away.

Bella testified about another incident that occurred when she was watching a movie with Kylie in Mother's room. She stated that on this occasion, Rachal moved her legs to the edge of Mother's bed, pulled her pants down, and placed his tongue on her vagina. Bella stated that Rachal stopped when Kylie started waking up.

At trial, Bella testified that Rachal had shown her his penis more than five times, had touched her vagina with his penis less than five times, had put his mouth on her vagina less than five times, had put her hand on his penis more than five times, and had touched her breasts less than five times. When asked whether this went on "the whole time that [she] knew Rachal," Bella answered, "Yes." Bella told the jury that something "uncomfortable" would happen "[e]very day" on the weekends she was with Mother and Rachal. She maintained that "all of these things" happened every weekend for two years. She later stated, however, that there were days that she was at home, and Rachal did not make her feel "uncomfortable" and "wouldn't do it."

---

[3]Bella stated that Kylie was a "newborn" during this incident.

## C. Bella's Outcry of the Abuse to Mother

Around December 27, 2022, Bella reported the abuse to Mother through a Snapchat message. In the message, Bella wrote, "Hey mommy[.] [Mother's grandmother] is acting like I stole her brush when I didn't[.] Oh and dada keeps on touching my private part and my boo and my butt[.] And that is not a lie[.]"[4] Mother responded, "Are you for real[?] [D]on't lie[.]" Bella replied, "Yes[,] I am for real[.]" When asked when that contact had occurred, Bella stated, "A year ago." During the exchange, Bella also told Mother that the contact had occurred more than once, stating that "he has been doing it since [she] was ten[.]" Mother then inquired, "So [does] he still touch you til this day[?]" Bella stated, "Yes."

Mother testified that she then called Rachal, and he told her that Bella was a liar. Mother then called Child Protective Services.

## D. The Forensic Interview, the SANE Exam, and Rachal's Arrest

In February 2023, Bella went to the Alliance For Children where she was interviewed by Trista Burden, a forensic interviewer.[5] According to Burden, during the interview, Bella disclosed that Rachal had been sexually abusing her. Burden testified that Bella provided sensory and periphery details pertaining to the abuse and

---

[4]Bella testified that she stated that the message was not a lie because she had gotten in trouble in the past for lying.

[5]Burden stated that the Alliance For Children is a children's advocacy center in Tarrant County.

that Bella stated that Rachal had put his mouth on her vagina, had caused his penis to contact her vagina, had made her touch his penis with her hand and mouth, and had shown her pornography. Burden stated that Bella told her that the first instance of abuse had occurred in the kitchen near the dishwasher. Bella informed Burden that Rachal had put his mouth on her vagina less than five times, had made contact between his penis and her vagina more than five times, and had touched her mouth with his penis less than five times.

In March 2023, Bella was taken to Cook Children's Medical Center, where she was examined by Theresa Fugate, a sexual assault nurse examiner (SANE). During the SANE exam, Bella told Fugate that Rachal had sexually abused her. Fugate testified that Bella told her that the abuse "started a couple days after he lived with us, probably, like, when [she] was 10 or nine." Bella stated that on this first occasion of abuse, Rachal touched her "chest" and "down where I pee from." She informed Fugate that Rachal had also "put his private" in her genitalia. Bella reported that Rachal's abuse included his penis and finger contacting her vagina, his mouth touching her genitals, and her mouth and hand touching his penis. Fugate stated that Bella exhibited no signs of anal, oral, or genital injury.

At trial, Loran White, a detective with the Mansfield Police Department, testified that he reviewed the forensic interview and ultimately wrote an arrest warrant

for Rachal.[6]  As pertinent to this appeal, Rachal was indicted for continuous sexual abuse of a young child and indecency with a child.

## E.  The Trial

The case was tried in June 2024.  Bella, Mother, Burden, Fugate, and White testified for the State at trial.[7]  After the State rested its case, Rachal moved for a directed verdict as to the count of continuous sexual abuse of a young child.  Rachal argued that while there had been "testimony about multiple events . . . there's been no testimony that at least two of the incidents were 30 days or more apart."  The trial court denied Rachal's motion.

Rachal later testified for the defense.  He stated that Bella was lying, and he said that he had never touched her "in any kind of sexual way" and that she had never touched him "in any kind of sexual way."  Rachal maintained that shortly before Bella disclosed the abuse to Mother, he had informed Mother that he had a child that Mother did not know about with "an ex."[8]  Rachal testified that he had told Mother— in Bella's presence—that he intended to financially support the child.  He also stated

---

[6]White also testified about pornography found on Rachal's phone, including pornography with titles like, "F***ed by her stepdad's huge black dick" and "Hot black teen gets f***ed by a huge black cock."  White indicated that Bella had also searched for pornography on her phone.

[7]The substance of their testimony is recounted above in our discussion of the facts.

[8]Rachal said that the child was around the same age as Kylie.

that he had planned to get Bella an iPhone 11 for Christmas in 2022 but that he bought her an older model instead. Rachal testified that Bella was "really disappointed" with the older model and that the allegations of abuse occurred shortly thereafter.

The jury ultimately found Rachal guilty of continuous sexual abuse of a young child and indecency with a child. This appeal followed.

## III. DISCUSSION

### A. Rachal's Motion for Directed Verdict

In his first point, Rachal argues that the trial court erred by denying his motion for directed verdict on the count of continuous sexual abuse of a young child.

#### 1. Standard of Review

We treat a complaint concerning a trial court's denial of a motion for directed verdict as a challenge to the sufficiency of the evidence. *Norris v. State*, No. 02-23-00298-CR, 2024 WL 3458077, at *4 (Tex. App.—Fort Worth July 18, 2024, pet. ref'd) (mem. op., not designated for publication) (citing *Williams v. State*, 937 S.W.2d 479, 482 (Tex. Crim. App. 1996)).

In our evidentiary-sufficiency review, we view all the evidence in the light most favorable to the verdict to determine whether any rational factfinder could have found the crime's essential elements beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S. Ct. 2781, 2789 (1979); *Bittick v. State*, 707 S.W.3d 366, 368 (Tex. Crim. App. 2024). This standard gives full play to the factfinder's responsibility to resolve

9

conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts. *See Jackson*, 443 U.S. at 319, 99 S. Ct. at 2789; *Harrell v. State*, 620 S.W.3d 910, 914 (Tex. Crim. App. 2021).

The factfinder alone judges the evidence's weight and credibility. *See* Tex. Code Crim. Proc. Ann. art. 38.04; *Martin v. State*, 635 S.W.3d 672, 679 (Tex. Crim. App. 2021). We may not re-evaluate the evidence's weight and credibility and substitute our judgment for the factfinder's. *Queeman v. State*, 520 S.W.3d 616, 622 (Tex. Crim. App. 2017). Instead, we determine whether the necessary inferences are reasonable based on the evidence's cumulative force when viewed in the light most favorable to the verdict. *Braughton v. State*, 569 S.W.3d 592, 608 (Tex. Crim. App. 2018); *see Villa v. State*, 514 S.W.3d 227, 232 (Tex. Crim. App. 2017) ("The court conducting a sufficiency review must not engage in a 'divide and conquer' strategy but must consider the cumulative force of all the evidence."). We must presume that the factfinder resolved any conflicting inferences in favor of the verdict, and we must defer to that resolution. *Braughton*, 569 S.W.3d at 608. Jurors may choose to believe or disbelieve all, some, or none of the evidence presented. *Edward v. State*, 635 S.W.3d 649, 655 (Tex. Crim. App. 2021).

To determine whether the State has met its burden to prove a defendant's guilt beyond a reasonable doubt, we compare the crime's elements as defined by a hypothetically correct jury charge to the evidence adduced at trial. *Gutierrez v. State*, 710 S.W.3d 804, 809 (Tex. Crim. App. 2025). Such a charge is one that accurately sets

10

out the law, is authorized by the indictment, does not unnecessarily increase the State's burden of proof or restrict the State's theories of liability, and adequately describes the particular offense for which the defendant was tried. *Id.* The law as authorized by the indictment means the statutory elements of the offense as modified by the charging instrument's allegations. *Id.*

### 2. Applicable Law

To establish the offense of continuous sexual abuse of a child, the State must prove the following elements: (1) the defendant "commit[ted] two or more acts of sexual abuse," (2) "during a period that is 30 or more days in duration," and (3) "at the time of the commission of each of the acts of sexual abuse, the [defendant was] 17 years of age or older and the victim [was] a child younger than 14 years of age." Tex. Penal Code Ann. § 21.02(b); *see Richard v. State*, 712 S.W.3d 643, 645–46 (Tex. App.—Houston [14th Dist.] 2024, pet. ref'd) (listing elements of continuous sexual abuse of a child). An "act of sexual abuse" includes indecency with a child by contact, if the defendant committed the offense in a manner other than by touching the child's breasts, and it also includes aggravated sexual assault. Tex. Penal Code Ann. § 21.02(c)(2), (4); *see also id.* §§ 21.11(a)(1), 22.021.

A defendant commits indecency with a child by contact if he engages in sexual contact with the child or causes the child to engage in sexual contact. *Id.* § 21.11(a)(1). The term "sexual contact" includes the following acts, if committed with the intent to arouse or gratify the sexual desire of any person: touching by a person of the anus or

11

any part of the genitals of the child or touching of any part of the body of a child with the genitals of a person. *Id.* § 21.11(c).

### 3. Analysis

Rachal's first point is centered on his argument that the State failed to prove that he committed two acts of sexual abuse over a period of thirty or more days. While he acknowledges that Bella testified that something "uncomfortable" happened every day on the weekends she was staying with him, he maintains that this does not equate to proof that he committed multiple acts of sexual abuse over a period of thirty or more days.

Turning to the evidence, Fugate testified that Bella told her during the SANE exam that the abuse "started a couple days after [Rachal] lived with [them], probably, like, when [she] was 10 or nine." Mother testified that Rachal moved in with her around October 2020. Bella told Fugate that on the first occasion of abuse, Rachal touched her "down where I pee from." A rational factfinder could conclude from that evidence that Rachal engaged in an act of sexual abuse—touching Bella's genitals—in October 2020 or early November 2020, shortly after he moved in with Mother.

Bella testified about two other acts of sexual abuse that occurred while she was watching Kylie in Mother's bedroom. According to Bella, during one of the incidents, Rachal came into the room, pulled his pants down, spread her legs, moved her pants away, and put his penis on top of her vagina. During the other incident—according

12

to Bella—Rachal moved her legs to the edge of Mother's bed, pulled her pants down, and placed his tongue on her vagina. Mother testified that Kylie was born in August 2021. Because Bella was watching Kylie during these two incidents, they would necessarily have had to occur in or after August 2021. Thus, a rational factfinder could conclude from the evidence that Rachal engaged in two acts of sexual abuse—touching Bella's genitals with his genitals and contacting her genitals with his tongue—in or after August 2021.

While our analysis could stop there—because there is evidence that Rachal committed an act of sexual abuse in October 2020 or early November 2020 and two more acts of sexual abuse in or after August 2021—there was other evidence to support the jury's verdict. Bella told the jury about several other specific instances in which Rachal had abused her, including the first instance of abuse in which he touched her vagina with his finger in the kitchen or the living room, an occasion when he grabbed her hand and placed it on his penis in the kitchen, an incident when she was playing hide-and-seek and Rachal made her touch his penis in a closet, and an instance in which his penis touched her mouth during an attempt at oral sex after he showed her pornography on his phone. She also told the jury that Rachal had put her hand on his penis more than five times and that something "uncomfortable"[9]

---

[9]In his brief, Rachal repeatedly mentions Bella's testimony that something "uncomfortable" happened every day she was staying with him. As noted by Rachal, some acts that made Bella feel "uncomfortable"—such as the touching of her breasts—"are not acts of sexual abuse for purposes of the Continuous Sexual Abuse

happened "[e]very day" on the weekends she was with Mother and Rachal. And when Bella reported the abuse to Mother in December 2022, she spoke of it as if it was still occurring, stating that "dada keeps on touching my private part." She also told Mother that "he has been doing it since [she] was ten[.]" When Mother asked whether Rachal still touched her "til this day," Bella stated, "Yes."

Burden and Fugate also testified about Bella's report of Rachal's abuse. Burden maintained that Bella provided details pertaining to the abuse and reported that Rachal had put his mouth on her vagina, had caused his penis to contact her vagina, and had made her touch his penis with her hand and mouth. Burden stated that Bella had informed her that Rachal had made contact between his penis and her vagina more than five times. Fugate testified that Bella reported that Rachal's abuse included

---

of a Child statute." To Rachal, this inexactitude in Bella's testimony as to what occurred during the various "uncomfortable" acts and when they took place indicates that the evidence is insufficient to support his conviction for continuous sexual abuse of a young child. But we need not parse out exactly what occurred during each "uncomfortable" act, nor need we determine exactly when each "uncomfortable" act took place. As noted above, Bella testified about an act of sexual abuse that occurred in October 2020 or early November 2020—Rachal's touching of her genitals—and she also testified about two acts of sexual abuse that happened in or after August 2021—the touching of her genitals with Rachal's genitals and the contacting of her genitals with his tongue. That testimony is sufficient to support his conviction. *See Dusenbery v. State*, No. 02-16-00125-CR, 2018 WL 4025078, at *6 (Tex. App.—Fort Worth Aug. 23, 2018, pet. ref'd) (mem. op., not designated for publication) ("The statute [for continuous sexual abuse of a young child] requires only two acts of sexual abuse."); *see also Meza v. State*, 706 S.W.3d 914, 921 (Tex. App.—Dallas 2024, pet. ref'd) ("The testimony of a child victim alone is sufficient to support a conviction for continuous sexual abuse of a child.").

14

his penis and finger contacting her vagina, his mouth touching her genitals, and her mouth and hand touching his penis.

After viewing all the evidence in the light most favorable to the verdict, we conclude that a rational trier of fact could have found, beyond a reasonable doubt, that Rachal committed two or more acts of sexual abuse against Bella during a period that is thirty or more days in duration. *See* Tex. Penal Code Ann. § 21.02(b); *Jackson*, 443 U.S. at 319, 99 S. Ct. at 2789; *see also Meza*, 706 S.W.3d at 923 n.5 (holding that jury could "deduce the logical consequence that the assaults occurred over more than thirty days" when appellant was alone with complainant only one day a week and the record reflected numerous sexual assaults). Even if we could have found to the contrary were we sitting as the factfinder, we cannot act as the "thirteenth juror," and we may not substitute our judgment for that of the jury. *See Thornton v. State*, 425 S.W.3d 289, 303 (Tex. Crim. App. 2014) (stating that a reviewing court should not act as a "thirteenth juror"); *Burgess v. State*, No. 02-19-00203-CR, 2021 WL 3556953, at *3 n.6 (Tex. App.—Fort Worth Aug. 12, 2021, no pet.) (mem. op., not designated for publication) ("[T]he factfinder alone—in this case, the jury—judges the evidence's credibility, and we may not act as a thirteenth juror, re-evaluating the weight and credibility of the evidence and, thus, substituting our judgment for that of the factfinder.").

We overrule Rachal's first point.

## B. Charge Error

In his second point, Rachal argues that the trial court erred by refusing to exclude "touching the breast of a child" from the jury's consideration of acts of sexual abuse in the application paragraph for the count of continuous sexual abuse of a young child.

### 1. Standard of Review

We must review "all alleged jury-charge error . . . regardless of preservation in the trial court." *Kirsch v. State*, 357 S.W.3d 645, 649 (Tex. Crim. App. 2012). In reviewing a jury charge, we first determine whether error occurred; if not, our analysis ends. *Id.*

### 2. Applicable Law

The purpose of a jury charge is to instruct the jurors on the law that is applicable to the case. *Vasquez v. State*, 389 S.W.3d 361, 366 (Tex. Crim. App. 2012); *see* Tex. Code Crim. Proc. Ann. art. 36.14. Accordingly, the charge "must contain an accurate statement of the law and must set out all the essential elements of the offense." *Vasquez*, 389 S.W.3d at 366 (quotation marks and citation omitted). "In examining the charge for possible error, reviewing courts 'must examine the charge as a whole instead of a series of isolated and unrelated statements.'" *Id.* (quoting *Dinkins v. State*, 894 S.W.2d 330, 339 (Tex. Crim. App. 1995)).

A jury charge typically contains an abstract portion and an application portion. *Byrd v. State*, No. 02-17-00173-CR, 2018 WL 1095545, at *3 (Tex. App.—Fort Worth

16

Mar. 1, 2018, no pet.) (mem. op., not designated for publication). "The abstract paragraphs serve as a glossary to help the jury understand the meaning of concepts and terms used in the application paragraphs of the charge." *Crenshaw v. State*, 378 S.W.3d 460, 466 (Tex. Crim. App. 2012). "The application paragraph is what explains to the jury, in concrete terms, how to apply the law to the facts of the case." *Yzaguirre v. State*, 394 S.W.3d 526, 530 (Tex. Crim. App. 2013).

When a definition or instruction on a theory of law is given in the abstract portion of the charge, the application paragraph must (1) specify all of the conditions to be met before a conviction under such a theory is authorized, (2) authorize a conviction under conditions specified by other paragraphs of the charge to which the application paragraph necessarily and unambiguously refers, or (3) contain some logically consistent combination of such paragraphs. *Vasquez*, 389 S.W.3d at 367. "Thus, if the application paragraph necessarily and unambiguously refers to another paragraph of the jury charge, then a conviction is authorized, and the trial judge need not *sua sponte* cut and paste that definition into the application paragraph." *Id.* (internal quotations omitted).

### 3. The Subject Charge

The abstract portion of the charge provided, in pertinent part:

A person commits the offense of continuous sexual abuse of [a] young child or disabled individual if, during a period of time that is 30 or more days in duration, the person commits two or more acts of sexual abuse regardless of whether the acts of sexual abuse are committed against one or more victims; and at the time of the commission of each of the acts

17

of sexual abuse, the actor is 17 years of age or older and the victim is a child younger than 14 years of age.

"Act of sexual abuse" means any act of aggravated sexual assault against a child and/or indecency with a child if the actor committed the offense in a manner other than by touching, including touching through clothing, the breast of a child.

. . . .

A person commits the offense of indecency with a child if, with a child younger than 17 years of age, whether the child is of the same or opposite sex and regardless of whether the person knows the age of the child at the time of the offense, the person engages in sexual contact with the child or causes the child to engage in sexual contact.

"Sexual contact" means any touching by a person, including touching through clothing, of any part of the breast or any part of the genitals of a child; or any touching of any part of the body of a child, including touching through clothing, any part of the genitals of a person with the intent to arouse or gratify the sexual desire of any person.

The application paragraph in the charge provided, in pertinent part:

Now, if you find from the evidence beyond a reasonable doubt that Carlos Jeremy Nelson Rachal, hereinafter called defendant, in the county of Tarrant, state of Texas, on or about the 1st day of August 2021, through on or about the 25th day of December 2022, during a period of time that is 30 days or more in duration, commit two or more acts of sexual abuse against [Bella], a child younger than 14 years of age, including an act or acts of sexual abuse constituting the offense of aggravated sexual assault of a child or an act or acts constituting the offense of indecency with a child, and at the time of the commission of each of these acts of sexual abuse the defendant was 17 years of age or older, then you will find the defendant guilty of the offense of continuous sexual abuse of [a] young child or disabled individual as charged in the indictment.

At trial, Rachal's counsel requested that the trial court include certain language

in the application paragraph of the charge, requesting that after the phrase "indecency

18

with a child," the court add the phrase "if the actor committed the offense in a manner other than by touching, including touching through the clothing, the breasts of a child." The trial court denied that request, noting, "[W]e've already defined that otherwise in the charge, and the jury is to consider the charge as a whole."

### 4. Analysis

In two recent cases, the Corpus Christi–Edinburg Court of Appeals has addressed jury-charge complaints similar to the one that Rachal makes here. *See Diaz v. State*, No. 13-22-00602-CR, 2024 WL 3818560, at *4–5 (Tex. App.—Corpus Christi–Edinburg Aug. 15, 2024, pet. ref'd) (mem. op., not designated for publication); *Lopez v. State*, No. 13-19-00601-CR, 2022 WL 3257484, at *3–4 (Tex. App.—Corpus Christi–Edinburg Aug. 11, 2022, pet. ref'd) (mem. op., not designated for publication). We find the reasoning in these opinions to be persuasive.

In *Lopez*, the defendant was convicted of, among other offenses, continuous sexual abuse of a young child and indecency with a child. 2022 WL 3257484, at *1. On appeal, the defendant argued that the charge contained "an illegal application paragraph" pertaining to the count of continuous sexual abuse because it "permitted the jury to convict him for conduct that [did] not constitute an act of sexual abuse—namely, sexual contact with [the complainant's] breasts." *Id.* at *3. In analyzing that complaint, the court of appeals noted that the abstract portion of the charge accurately defined "act of sexual abuse" to include the predicate offense of indecency with a child by sexual contact other than by touching the child's breasts. *Id.* The

19

court stated that the abstract portion also accurately defined "indecency with a child." *Id.* As to the application paragraph, the court noted that the jury was asked whether the evidence proved that the defendant "committed two or more acts of sexual abuse against [the complainant], namely aggravated sexual assault of a child and indecency with a child." *Id.* Notably, "[t]he application paragraph did not state that the indecency offense(s) must have been committed by means 'other than by touching, including touching through the clothing, the breast of a child.'" *Id.*

The court of appeals rejected the defendant's argument that the abstract portion conflicted with the application paragraph and that the application paragraph was "illegal" because it did not explicitly exclude touching the complainant's breast as a predicate offense. *Id.* at *4. The court stated that the defendant's interpretation of the charge "selectively focuse[d] on the definition of 'indecency with a child' but ignore[d] the definition of 'acts of sexual abuse,' which properly limited the types of sexual contact the jury could consider." *Id.* Noting that a jury charge must be "considered in its entirety" and that "the application paragraph necessarily required the jury to refer to and incorporate both definitions into the application paragraph," the court held that the jury charge did not contain error. *Id.*

In *Diaz*, a defendant was convicted of, among other offenses, continuous sexual abuse of a young child and indecency with a child. 2024 WL 3818560, at *1. On appeal, the defendant argued that the jury charge "inappropriately authorized the jury to convict [him] of continuous sexual abuse of a child based on the act of breast-

20

touching." *Id.* at *4. In addressing that argument, the court of appeals noted that the abstract portion of the charge "correctly instructed the jury that indecency with a child by any means other than breast-touching is a predicate 'act of sexual abuse' for purposes of continuous sexual abuse." *Id.* The abstract portion of the charge also correctly defined the term "indecency with a child" to include breast-touching. *Id.* The application portion of the charge asked the jury whether the evidence proved beyond a reasonable doubt that the defendant "commit[ted] two or more acts of sexual abuse against [the complainant], . . . namely, indecency with a child by contact." *Id.* As noted by the court of appeals, "The application paragraph did not explicitly state that the indecency offenses must have been committed in a manner 'other than by touching, including touching through the clothing, the breast of a child.'" *Id.*

In rejecting the defendant's argument that the jury charge contained error, the court of appeals referenced its earlier opinion in *Lopez.* *Id.* (citing *Lopez*, 2022 WL 3257484, at *3–4). The court noted that, just as in *Lopez*, "[t]he jury was explicitly instructed that breast-touching did not constitute an 'act of sexual abuse.'" *Id.* at *5. And because there was nothing in the record to indicate that the jury did not understand or follow the trial court's instructions, the appellate court held that the trial court's jury charge did not contain any error. *Id.*

Similar to the charges at issue in *Lopez* and *Diaz*, here, the jury charge's abstract portion accurately defined "[a]ct of sexual abuse" as "any act of aggravated sexual assault against a child and/or indecency with a child if the actor committed the

21

offense in a manner other than by touching, including touching through clothing, the breast of a child." The abstract portion also accurately defined "indecency with a child" as engaging in "sexual contact," which was defined to include "any touching by a person, including touching through clothing, of any part of the breast . . . of a child." While the application paragraph did not state that the indecency offense must have been committed by means other than touching the breast of a child, it did ask the jury to consider whether the evidence proved beyond a reasonable doubt that Rachal "commit[ed] two or more acts of sexual abuse against [Bella], including . . . an act or acts constituting the offense of indecency with a child." Reading the charge as a whole, which we must, we hold that the application paragraph correctly authorized Rachal's conviction for continuous sexual abuse of a young child if, during the requisite period, he committed two or more acts of sexual abuse, including sexual contact with Bella, other than by touching her breast. *See Vasquez*, 389 S.W.3d at 366; *Diaz*, 2024 WL 3818560, at \*4–5; *Lopez*, 2022 WL 3257484, at \*3–4; *see also EspinalCruz v. State*, No. 05-22-00626-CR, 2023 WL 8615813, at \*4 (Tex. App.—Dallas Dec. 13, 2023, no pet.) (mem. op., not designated for publication).

We overrule Rachal's second point.

## C. Ineffective Assistance of Counsel

In his third and fourth points, Rachal argues that he was denied the effective assistance of counsel.

### 1. Standard of Review and Applicable Law

The Sixth Amendment guarantees a criminal defendant the effective assistance of counsel. *Ex parte Scott*, 541 S.W.3d 104, 114 (Tex. Crim. App. 2017); *see* U.S. Const. amend. VI. To establish ineffective assistance, an appellant must prove by a preponderance of the evidence that his counsel's representation was deficient and that the deficiency prejudiced the defense. *Strickland v. Washington*, 466 U.S. 668, 687, 104 S. Ct. 2052, 2064 (1984); *Tanner v. State*, 707 S.W.3d 371, 376 (Tex. Crim. App. 2024). The record must affirmatively demonstrate that the claim has merit. *Thompson v. State*, 9 S.W.3d 808, 813 (Tex. Crim. App. 1999). The two prongs of *Strickland* need not be analyzed in any particular order, and if a defendant fails to make the required showing in one, we need not address the other. *Ex parte Martinez*, 330 S.W.3d 891, 901 (Tex. Crim. App. 2011) (citing *Strickland*, 466 U.S. at 697, 104 S. Ct. at 2069).

In evaluating counsel's effectiveness under the deficient-performance prong, we review the totality of the representation and the particular circumstances of the case to determine whether counsel provided reasonable assistance under all the circumstances and prevailing professional norms at the time of the alleged error. *See Strickland*, 466 U.S. at 688–89, 104 S. Ct. at 2065; *Nava v. State*, 415 S.W.3d 289, 307 (Tex. Crim. App. 2013); *Thompson*, 9 S.W.3d at 813–14. Our review of counsel's representation is highly deferential, and we indulge a strong presumption that counsel's conduct was not deficient. *Ex parte Garza*, 620 S.W.3d 801, 827 (Tex. Crim. App. 2021); *Nava*, 415 S.W.3d at 307–08.

An appellate court may not infer ineffective assistance simply from an unclear record or a record that does not show why counsel failed to do something. *Menefield v. State*, 363 S.W.3d 591, 593 (Tex. Crim. App. 2012); *Mata v. State*, 226 S.W.3d 425, 432 (Tex. Crim. App. 2007). Trial counsel "should ordinarily be afforded an opportunity to explain his actions before being denounced as ineffective." *Menefield*, 363 S.W.3d at 593. If trial counsel did not have that opportunity, we should not conclude that counsel performed deficiently unless the challenged conduct was "so outrageous that no competent attorney would have engaged in it." *Nava*, 415 S.W.3d at 308. Direct appeal is usually inadequate for raising an ineffective-assistance-of-counsel claim because the record generally does not show counsel's reasons for any alleged deficient performance. *See Tanner*, 707 S.W.3d at 377; *Menefield*, 363 S.W.3d at 592–93; *Thompson*, 9 S.W.3d at 813–14.

### 2. Analysis as to Rachal's Third Point

In his third point, Rachal argues that he was denied effective assistance when his trial counsel declined the trial court's offer to question jurors who discussed the case mid-trial and who seemingly talked about whether he would testify.

#### a. Background of the Complaint

During the middle of Rachal's cross-examination of Bella, the trial court recessed the trial for lunch. When the trial resumed, an attorney who was not participating in the trial—Stillman Baker—informed the trial court about a

24

conversation he had overheard at a nearby restaurant. Outside of the jury's presence, but on the record, the following exchange occurred:

> MR. BAKER: I was at lunch at the Jimmy John's around the corner. I saw two people sitting together wearing juror badges. I did overhear some statements from them, one in particular referring to something about what a defense lawyer had said previously. And then sometime later, I heard some statements that appeared to be them wondering about whether or not someone was going to take the stand. I think the exact words were something like "if he takes the stand or not."

> THE COURT: Did you take that from the tone of the conversation to be "if he" being if the defendant takes the stand?

> MR. BAKER: That's sort of what it sounded like it could have been.

> THE COURT: Okay. And how do you know that these two persons were jurors in a pending case or a case that is before this court today?

> MR. BAKER: They were wearing juror badges. And I came back to the building just because my briefcase was back here, and I asked the bailiff if he had two jurors--one of them was a larger, heavier-set man, I think, in a green shirt and another skinnier white guy with a ponytail, I think, in a gray shirt, and he said yes. And so I told you what I saw.

> THE COURT: The guy you described in a--with a ponytail, we know who that is correct?

> THE BAILIFF: I think it's Juror No. 1.

> THE COURT: Number 1. Is that [states juror's name]?

> THE BAILIFF: Yes, Your Honor.

> THE COURT: Okay. And from the tone of the conversation, did you get that this was some--a type of a child sexual assault trial as well?

MR. BAKER:  Yes.

THE COURT:  State, this is the only child sexual assault trial that's going on in the courthouse today, correct?

[PROSECUTOR]:  That's my understanding.

The trial court then asked whether either side had further questions for Baker, and both sides indicated that they did not.  The trial court said it was going to bring out Juror No. 1 to "ask him if he had a conversation, who he had a conversation with, what they talked about, [and] if he remembers the admonishment . . . not [to] discuss anything about this case."  It indicated that it would also inquire as to whether Juror No. 1 had heard and understood the instruction, why he did not follow the instruction, and whether he had already made up his mind about the case.  The trial court stated that it would ask the same questions of the "other juror" referenced by Baker.  It told both sides that they would not be allowed to ask questions of the jurors directly, but it indicated that they could provide questions for the court to ask.

When the trial court asked whether either side had any questions they wanted to ask the jurors who had allegedly violated the court's admonishments, Rachal's trial counsel stated, "No, Your Honor, but the Defense would actually request that instead of the jurors being questioned that they just be readmonished on the rules versus the inquiry."  The trial court responded, "[I]f that's what the Defense wants, that's what the Defense is going to get."  When the jury was brought back into the courtroom,

26

the trial court again admonished them not to discuss the case until after they had heard all of the evidence and had been sent to the jury room to consider their verdict.

In his brief, Rachal contends that he was denied effective assistance when his trial counsel declined the trial court's offer to question the jurors who had been discussing the case at the restaurant. *See* Tex. Code Crim. Proc. Ann. art. 36.22 ("No person shall be permitted to converse with a juror about the case on trial except in the presence and by the permission of the court."); *see also Ocon v. State*, 284 S.W.3d 880, 886 (Tex. Crim. App. 2009) (stating that "it is incumbent upon the party moving for a mistrial to request an inquiry of the jurors" concerning allegations of jury misconduct); *Delrio v. State*, 840 S.W.2d 443, 445 (Tex. Crim. App. 1992) (stating that the right to an impartial jury "must be pressed in some fashion at trial before reversal of [a defendant's] conviction" based on a breach of the right).

### b. Evaluation of Deficient-Performance Prong

The record is silent regarding why Rachal's trial counsel requested that the trial court not question the jurors who had been discussing the case at the restaurant. Indeed, Rachal did not file a motion for new trial. Based on this record, we cannot say that his trial counsel was deficient. *See Menefield*, 363 S.W.3d at 593 ("Trial counsel should ordinarily be afforded an opportunity to explain his actions before being denounced as ineffective." (quotation omitted)); *Griffin v. State*, No. 14-12-00688-CR, 2013 WL 3770921, at *4 (Tex. App.—Houston [14th Dist.] July 16, 2013, pet. ref'd) (mem. op., not designated for publication) ("When, as in this case, there is no proper

27

evidentiary record developed at a hearing on a motion for new trial, it is extremely difficult to show that trial counsel's performance was deficient." (footnote omitted)); *Kuchenbacker v. State*, No. 05-10-01245-CR, 2012 WL 1522157, at *1 (Tex. App.—Dallas May 2, 2012, no pet.) (mem. op., not designated for publication) ("In most cases, a silent record will not overcome the strong presumption of counsel's reasonable assistance.").

Further, we are unable to say that no competent attorney would have acted as Rachal's trial counsel did under similar circumstances. Rachal's trial counsel may have concluded that the trial court's questioning of the jurors might have antagonized them to the detriment of the defense. Or counsel may have thought that questioning the jurors would have placed undue emphasis on Rachal's testimony and on the impact of his decision whether to testify. Trial counsel might have also anticipated that Rachal would testify at trial—as he later did during the defense's case-in-chief—and thus, counsel may not have been concerned about jurors pondering whether Rachal would testify.[10]

---

[10]In his reply brief, Rachal attempts to counter this argument, disagreeing with the notion that his trial counsel knew that he would testify in his own defense, stating instead, "It is much more likely that he felt compelled to testify because jurors were wondering if he would." But that argument is pure speculation; there is nothing in the record—such as testimony at a hearing on a motion for new trial—to support it, and we may not infer ineffective assistance from an unclear record. *See Menefield*, 363 S.W.3d at 593; *Mata*, 226 S.W.3d at 432.

28

Given the possibility that Rachal's trial counsel's decision to decline the trial court's offer to question the jurors was a legitimate trial strategy, we hold that Rachal has not met his burden of showing by a preponderance of the evidence that his trial counsel's representation fell below the standard of prevailing professional norms. *See Strickland*, 466 U.S. at 688, 104 S. Ct. at 2065; *Ortiz v. State*, 93 S.W.3d 79, 88–89 (Tex. Crim. App. 2002) ("If counsel's reasons for his conduct do not appear in the record and there is at least the possibility that the conduct could have been legitimate trial strategy, we will defer to counsel's decisions and deny relief on an ineffective assistance claim on direct appeal."); *see also Bennett v. State*, No. 07-21-00223-CR, 2022 WL 2230473, at *2 (Tex. App.—Amarillo June 21, 2022, no pet.) (mem. op., not designated for publication) ("It could well be that counsel's decision to forgo an objection was a strategical decision. Indeed, courts have recognized that withholding objection to avoid garnering more attention on a matter can be reasonable trial strategy.").

We overrule Rachal's third point.

### 3. Analysis as to Rachal's Fourth Point

In his fourth point, Rachal argues that he was denied effective assistance when his trial counsel failed to object to White's alleged bolstering of Bella's testimony.

### a. Background of the Complaint

Rachal complains about two instances of White's alleged bolstering of Bella's testimony. First, he points to the following exchange that occurred during the State's direct examination of White:

Q. Okay. So you said the SANE hadn't been scheduled yet. Did you get that SANE report back?

A. Yes, I did.

Q. Okay. Did that change anything about your probable cause?

A. No.

Q. Did that add anything to the corroboration?

A. It did.

Q. What kind of things did it add?

A. She gave again the same details that she provided for the forensic, which, again, for a child to be able to say the details that had happened to her again after over a month, that shows that there's truth to what she's saying.

Next, Rachal points to the following exchange that occurred later during the State's examination of White:

Q. Okay. Okay. So you reviewed the phones and the SANE after you wrote your police warrant--or, I'm sorry, your arrest warrant. Is there anything that gave you pause or red flags about this--about this investigation?

A. No.

Q. And if there were, would you have told us?

A. Yes.

Q. And if you had any concerns about the SANE or new information regarding the SANE--the SANE exam or these searches, would you have gotten in contact with someone at the district attorney's office and let them know that something about this case has changed?

A. If I felt that something had changed, yes, absolutely.

In his brief, Rachal contends that he was denied the effective assistance of counsel when his trial counsel failed to object to White's complained-of testimony. *See Rojas v. State*, No. 02-22-00039-CR, 2023 WL 4115863, at *11 (Tex. App.—Fort Worth June 22, 2023, pet. ref'd) (mem. op., not designated for publication) ("The State . . . may not elicit expert testimony that a particular child is telling the truth or that child complainants as a class are worthy of belief.").

### b. Evaluation of Deficient-Performance Prong

The record is silent regarding why Rachal's trial counsel did not object to White's alleged bolstering of Bella's testimony. As noted above, Rachal did not file a motion for new trial. Thus, based on this record, we cannot say that his trial counsel was deficient. *See Lopez v. State*, 343 S.W.3d 137, 143–44 (Tex. Crim. App. 2011) (holding that appellant did not meet his burden to prove counsel's deficient performance when record did not contain any explanation as to why counsel did not object to opinion testimony about complainant's credibility); *Burdick v. State*, No. 02-11-00171-CR, 2012 WL 4010415, at *5 (Tex. App.—Fort Worth Sept. 13, 2012, no pet.) (mem. op., not designated for publication) ("Because the record here is silent as

31

to [c]ounsel's reason for failing to object, we are constrained to hold that [a]ppellant has failed to rebut the presumption that [c]ounsel acted reasonably."); *McFee v. State*, No. 01-98-01190-CR, 1999 WL 1063442, at *1 (Tex. App.—Houston [1st Dist.] Nov. 24, 1999, no pet.) (not designated for publication) ("When there is no motion for new trial, and, as here, the record is silent on counsel's reasons for his actions, we will not speculate as to counsel's trial strategy.").

Further, we are unable to say that no competent attorney would have similarly not objected to the complained-of testimony. Rachal's trial counsel may have thought that objecting to the testimony would have drawn unnecessary attention to it. Given the possibility that Rachal's trial counsel's decision to not object to the complained-of testimony was a legitimate trial strategy, we hold that Rachal has not met his burden of showing by a preponderance of the evidence that his trial counsel's representation fell below the standard of prevailing professional norms. *See Strickland*, 466 U.S. at 688, 104 S. Ct. at 2065; *Bennett*, 2022 WL 2230473, at *2 (recognizing that withholding an objection to avoid garnering more attention on a matter can be a reasonable trial strategy); *Vega v. State*, 610 S.W.3d 79, 84 (Tex. App.—San Antonio 2020, no pet.) (rejecting appellant's argument that "no reasonable trial strategy could justify his counsel's failure to object to the inadmissible bolstering hearsay"); *Alvarado v. State*, No. 08-15-00352-CR, 2018 WL 6629699, at *3, *5 (Tex. App.—El Paso Dec. 19, 2018, pet. ref'd) (not designated for publication) (rejecting appellant's complaint that he was denied effective assistance when his trial counsel "fail[ed] to object to the

improper bolstering of the child complainant's testimony" when complaint was "raised for the first time on direct appeal, providing no opportunity for trial counsel to explain her reasoning or trial strategy").

We overrule Rachal's fourth point.

## D. Cumulative Error

In his fifth point, Rachal argues that the errors in this case, even if not harmful standing alone, have a cumulative harmful effect that casts significant doubt on the jury's verdict. The Texas Court of Criminal Appeals has held that "[i]t is conceivable that a number of errors may be found harmful in their cumulative effect." *Chamberlain v. State*, 998 S.W.2d 230, 238 (Tex. Crim. App. 1999). "However, non-errors may not cumulatively produce harm." *Absalon v. State*, 478 S.W.3d 1, 20 (Tex. App.—Corpus Christi–Edinburg 2014) (citing *Hughes v. State*, 24 S.W.3d 833, 844 (Tex. Crim. App. 2000), *aff'd*, 460 S.W.3d 158 (Tex. Crim. App. 2015). Here, Rachal has failed to prove that any error occurred; thus, there is no error to cumulate. *See Baugus v. State*, No. 02-22-00015-CR, 2023 WL 3370718, at *16 (Tex. App.—Fort Worth May 11, 2023, pet. ref'd) (mem. op., not designated for publication) ("Baugus's cumulative-error complaint lacks merit because there is no error to cumulate."); *Abel v. State*, No. 02-18-00051-CR, 2020 WL 5048078, at *36 (Tex. App.—Fort Worth Aug. 27, 2020, no pet.) (per curiam) (mem. op., not designated for publication) (holding that because the court had overruled appellant's other appellate issues, his "cumulative-error complaint lack[ed] merit because there [was] no error to cumulate"); *Absalon*,

478 S.W.3d at 20 ("Having found no error in our review of Absalon's other appellate issues, we conclude that the cumulative error doctrine does not apply.").

We overrule Rachal's fifth point.

## IV.  CONCLUSION

Having overruled Rachal's five points, we affirm the trial court's judgments.

/s/ Dana Womack

Dana Womack
Justice

Do Not Publish
Tex. R. App. P. 47.2(b)

Delivered:  October 2, 2025